Filed 2/10/22  In re R.B. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.B. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.B., <br><br> Defendant and Appellant. | G060641 <br><br> (Super. Ct. Nos. 20DP1110 & 20DP1111) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*     \*     \*

INTRODUCTION

In August 2021, the juvenile court terminated the dependency proceedings involving 10-year-old R.B. and eight-year-old S.B. (collectively the children). The court's exit orders granted joint legal and physical custody to the children's parents, M.B. (father) and S.J. (mother), and placed the children's primary residence with mother. Father appeals the exit orders. We affirm.

The Orange County Social Services Agency (SSA) concedes on appeal there was ample evidence that would have supported an order establishing father's home as the primary residence. However, the juvenile court did not err because substantial evidence also amply supported its findings, and the court's orders did not exceed the limits of its discretion. The juvenile court praised mother's performance on her case plan and questioned father's credibility. At the hearing terminating the dependency proceedings, the children's trial counsel supported the juvenile court's decision.

Father also contends that SSA and the juvenile court failed to follow the proper notice procedures under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). Because the children were never placed in foster care or in an adoptive home, but rather were removed from the custody of one parent and placed in the custody of the other, the requirements of ICWA were never at issue here.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In September 2020, SSA filed a petition alleging that R.B., S.B., and B.R.[1] came within the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (b)(1). (Further undesignated statutory references are to the Welfare and Institutions Code.) The petition alleged, among other things, mother may have a substance abuse problem and did have ongoing mental health issues; when mother took medication she would go to sleep and the children would have to take care of themselves; mother and B.R.'s father had engaged in acts of domestic violence, and arguments in the presence of the children; mother and father had a history of domestic violence; and B.R.'s father had a substance abuse problem.

At the detention hearing, mother and father denied any American Indian heritage. All three minors were removed from mother's care; the children were placed with father, and B.R. was placed with the maternal grandmother.

Before the jurisdiction hearing, father advised SSA that he was registered with the Oneida Indian Nation, but could not provide an enrollment number. Father also stated that his father (the children's paternal grandfather) was registered with the Oneida Indian Nation, and provided the paternal grandfather's birthplace, but was unable to provide his birthdate, further family information, or contact information for other relatives who might be able to provide additional information. SSA contacted the Oneida Indian Nation, and was informed that father and the children were neither enrolled nor eligible for enrollment in the tribe.

At the jurisdiction hearing, both mother and father pled no contest to the petition, as amended by interlineation, and the juvenile court found the allegations of the amended petition true by a preponderance of the evidence. At the disposition hearing, the

---

[1] B.R. is the children's half sibling; B.R.'s parents are mother and J.R. B.R.'s status is not at issue in this appeal.

court declared the children to be dependents of the juvenile court, and found that reasonable efforts had been made to prevent or eliminate the need for removal of the children from their home, that the children's physical, mental health, developmental, and educational needs were being met, and that continued placement was necessary and appropriate.

After a contested evidentiary six-month review hearing, the juvenile court terminated the dependency proceedings, ordered that mother and father would have joint legal and physical custody of the children, and that the children's primary residence would be with mother. Father filed a timely notice of appeal from the exit orders.

DISCUSSION

I.

*PLACEMENT IN MOTHER'S HOME*

When it terminated dependency over the children, the juvenile court entered an order pursuant to section 362.4 determining that the children's primary residence would be with mother. We review this order for abuse of discretion. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863.) We may not disturb an order under section 362.4 "unless the court ""'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'"""" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

Father argues that placing the children's primary residence with mother was not in the children's best interest. SSA concedes that "Father makes a legitimate argument for custody within his present claim. The [children] were by all accounts safe and secure in his home . . . and there was much to commend as to Father's immediate and sustained attention to their needs after their initial removal from Mother's care in late 2020."

4

At the disposition hearing in February and March 2021, the social worker testified that "there should be minimal disruption to the children. They have adjusted well to the father, and they're doing well in the care of the father. However, . . . we are not opposed to the 50/50 [custody]" if mother completed her case plan and finished all requirements set for her.

In a June 2021 status review report, the social worker provided the following assessment and evaluation:

"The father has continued to maintain a stable home for the children during this period of supervision. The father has completed the majority of the current case plan. The undersigned has continued to complete monthly contact visits to the home and during the visits both children have expressed that they have no issues continuing to live with the father at his home. The undersigned has observed the father's interaction with both of the children, and they seem to be thriving in his care. The undersigned has no concerns regarding the safety of the children in the father's care at this time.

"The mother has also continued to maintain a stable home for both children during this period of supervision. The mother has also completed most of the current case plan. The undersigned has also been to the home of the mother when the children are visiting her and has no concerns regarding the mother's interaction with both children or for the safety of the children while they are in her care.

"The mother and father have mitigated the majority of the issues that brought the children to the attention of the Court. The undersigned has observed the mother and father taking care of the children and they both seem very attentive and connected to them. The risk of the children being removed from the home of the father is very low at this time due to the father's continued stability.

"Though the mother and father continue to disagree regarding the mother's visitation, there are no further child welfare concerns present with this case to justify that it remain open."

At the six-month review hearing, SSA requested that the juvenile court terminate the dependency cases and order that mother and father share legal and physical custody with a 50/50 split of parenting time "to the extent that that is achievable." Mother argued for a 50/50 parenting split, but she requested that her home be the primary residence "if the court is not inclined to grant a 50/50 custody arrangement" so that the children "can live with their mother, can attend a well-funded safe school, and also live with their two other siblings." Father requested he be made the "primary parent."

The children's counsel argued that the children's need for stability outweighed the benefits of a 50/50 custody arrangement. The children's counsel also agreed with father that the time being spent travelling between mother's and father's homes during the week "is not in their best interest." The children's counsel then stated: "So with that in mind, I'm now in a position where I have to argue which full-time home and school I believe would be in the [children's] best interest. At this time I do believe a more primary home should be with the mother." This recommendation was based on the resources available at the school near mother's home; mother's recovery, dedication to the children, insight into how the case started, and remorse; and the children's exposure to father's negative communications regarding mother and B.R.'s father.

The juvenile court granted joint legal and physical custody with primary residence to the mother. The court concluded this arrangement was in "the best interest of the [children]," and stated that its ruling was based on findings regarding father's history of domestic violence and mother and father's inability to cooperate during the dependency proceedings; mother's progress with her case plan and progress in addressing the issues leading to the dependency proceeding; and mother's credibility as a witness vis-à-vis father. All of these findings are supported by substantial evidence in the record.

In 2019, father was convicted of violating Penal Code section 243, subdivision (e)(1) (battery against a domestic partner) against mother in 2017. A restraining order was issued against father in 2018 to protect mother and the children.

6

Father claimed mother had lied to the police about the battery, but he had pled guilty to the charge "just to move forward as he hadn't seen the children in 2 years."

Mother testified that, while the children were in father's car on one of the days during the six-month review hearing, father telephoned mother and in "a very loud abrasive tone" told mother she did not care about the children, the children were only temporary and mother's newborn took precedence over them in her life, mother did not care about the children and was "a horrible f'ing mother," and mother and B.R.'s father were drug addicts. Father refused to release the children to B.R.'s father and yelled obscenities at him. Father admitted in court he refused to release the children to B.R.'s father because "he's a drug addict."

On a previous occasion, father told a visitation supervisor, in front of the children, that mother steals father's money, is a drug addict, and doesn't care about the children. Father denied ever having disparaged mother in front of the children. The juvenile court found that testimony not credible: "The father, on the other hand, could not give a straight answer to any question that was posed before him."

At the six-month review hearing, father testified: "I've only moved twice in the past eight years. [Mother] has moved double or triple that in the past five. I think there's too much inconsistency happening over there, as well as recovering drug addicts, two of them, in the same household." Father also testified that mother "continually lied about her address," and attempted to testify mother filed her tax returns late.

The juvenile court rejected father's attempts to besmirch mother: "The father took every opportunity to criticize or shoot down the mother, even if it was inconsistent with the evidence before the court, and frankly was nonresponsive to the question being posed. [¶] The father seemed less focused on the best interest of the [children] . . . than ensuring that the mom was seen by the court as being incompetent, being hooked on drugs currently, and that the [children] did not want to be around her in the first place, which is not consistent with the evidence." The court further noted it had

7

"concerns that the father's resentment of the mother is affecting her relationship with the [children]."

As for mother's progress during the dependency proceedings, the record fully supports the juvenile court's findings that "Mom has passed this court's requirements with flying colors. [¶] She has completed her case plan, she has been deemed safe by the social services agency and by this court for sometime." SSA noted in a June 2021 status review report that mother's cooperation with the case plan and efforts and progress toward alleviating or mitigating the issues leading to dependency had been substantial. Mother completed the court-ordered parenting classes: "[D]uring the in-home parenting coach sessions the mother was very engaged and followed directions well. The mother was also very consistent in attending with all the sessions with the program and by the end of the parenting coach session was observed to be utilizing many of the skills that she was taught during the in-home parenting coach sessions." Mother also completed individual therapy: "The mother apparently has completed the entire program and made great progress in the program. In case notes read to the undersigned it stated that the mother had addressed her issues of substance abuse quite openly and gained insight and addressed the different reasons the child[ren were] taken into protective care." Mother also enrolled, participated in, and completed a substance abuse outpatient treatment program: "[M]other had addressed her issues of substance abuse quite openly and . . . she addressed her triggers with substance abuse during the program. [¶] Further, the mother will be attending the aftercare part of the program one time per month so that the mother can continue to gain insight with her sobriety." All of mother's substance abuse tests were negative. Mother had unsupervised visitation with the children every other weekend. The children "love visiting the mother" and "seem very connected to the mother."

Father offers evidence from the record supporting his contention that the children should have been placed in his primary care. In June 2021, B.R. slipped and fell

8

into a jacuzzi while mother was holding her newborn, and R.B. pulled B.R. out of the jacuzzi. A child abuse report was taken, and was determined to be unfounded. Father contends this incident continued mother's previous pattern of being overwhelmed when caring for all her children, and of parentifying R.B. Father's home was safe and stable for the children. Father had prepared for the children to attend school near his home starting in August 2021, and had a 504 plan[2] in place for S.B., who had attention deficit hyperactivity disorder and learning disabilities. But even accepting all of the evidence offered by father, we cannot say that the juvenile court's decision to make mother's home the children's primary residence was an abuse of discretion.

In his reply brief, father argues that the juvenile court failed to consider the children's best interest and the totality of the circumstances in placing the children with mother. We reject both of these arguments. The juvenile court specifically stated on the record that its orders were based on the children's best interest, and a review of the court's reasoning proves the truth of that statement. Further, the court reviewed and considered all SSA reports which addressed the jacuzzi incident, as well as the testimony of all witnesses. That the court did not specifically address the jacuzzi incident in announcing its decision does not mean the court did not consider it.

Father also argues he was prejudiced by the juvenile court's order because he will have to meet a heightened burden challenging the custody order in the family court than he would have faced in the juvenile court. Section 302, subdivision (d) provides: "Any custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction pursuant to Section 362.4 regarding a child who has been previously adjudged to be a dependent child of the juvenile court shall be a final

---

[2] "Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.) and the federal implementing regulations require public schools to provide a plan of accommodation for children with qualifying disabilities to satisfy their special needs." (*In re I.B.* (2020) 53 Cal.App.5th 133, 144, fn. 4.)

judgment and shall remain in effect after that jurisdiction is terminated. The order shall not be modified in a proceeding or action described in Section 3021 of the Family Code unless the court finds that there has been a *significant change of circumstances* since the juvenile court issued the order and *modification of the order is in the best interests of the child.*" (Italics added.)

Father challenges the exit orders, not the order terminating the dependency proceeding. Therefore, even if we were to reverse the order under section 362.4 regarding making mother's home the children's primary residence, the custody issue would be remanded to the family law court, not the juvenile court. "While remand to a court different from the one which issued the judgment appealed from is, to say the least, unusual, such a result is necessarily inherent in section 362.4, which expressly contemplates future proceedings in the family courts. By providing that the exit order be filed in any dissolution case between the parents, the Legislature has demonstrated an intent that any future court proceedings in which custody is in issue be in the family court. When the merits of a section 362.4 exit order are at issue (as distinct from the validity of termination itself), the time lag inherent in the appellate process itself means that any remand must necessarily be directly to the family court. Who else is there when juvenile court jurisdiction has been correctly terminated?" (*In re John W.* (1996) 41 Cal.App.4th 961, 976-977; see *In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1098-1099 [affirming order terminating dependency jurisdiction, reversing juvenile court's order regarding custody, visitation, and child support, and remanding those issues to the family court]; *In re Phoenix B.* (1990) 218 Cal.App.3d 787, 794-795 ["juvenile court does not have jurisdiction to resolve custody disputes concerning nondependent children"; complaining parent's remedy is in a family court proceeding].)

Father cites two cases that he contends establish that if orders made at a hearing under section 362.4 are reversed, remand is to the juvenile court. These cases, however, are distinguishable. The court in *In re Elizabeth M.* (2008) 158 Cal.App.4th

10

1551, 1560 reversed the judgment terminating the dependency proceeding, not the exit orders; remand to the juvenile court was therefore required. The appellate court in that case noted that, after the juvenile court modified its judgment to incorporate the father's visitation schedule, "[a]ny change from that schedule *in the family court* will require the notice and evidence [the father] was promised." (*Ibid.*, italics added.) In *In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123, the court held: "When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation," which "become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court." The appellate court remanded the visitation order to "the trial court," while all previous references in the opinion regarding the dependency proceedings were to the "juvenile court" or the "court." (*Id.* at p. 1124.) At best, it is unclear whether the remand was to the juvenile court or the family court.

## II.

### *ICWA DUTIES OF INQUIRY AND NOTICE*

Father argues that the juvenile court's orders must be reversed because the court failed to follow the proper procedures under ICWA. A juvenile court's ICWA findings are reviewed for substantial evidence. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

Given the children's placement, ICWA never came into play in this matter. "By its own terms, the act requires notice only when child welfare authorities seek permanent foster care or termination of parental rights; it does not require notice *anytime* a child of possible or actual Native American descent is involved in a dependency

11

proceeding." (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 14.)[3] Here, the children were never placed in foster care or in an adoptive home. After being removed from mother's custody, the children were placed with father and remained in his custody and care until the juvenile court issued its exit orders. "ICWA and its attendant notice requirements do not apply to a proceeding in which a dependent child is removed from one parent and placed with another." (*In re M.R.* (2017) 7 Cal.App.5th 886, 904; see *In re A.T.* (2021) 63 Cal.App.5th 267, 274-275.)

In his reply brief, father contends that, with proper notice, the tribe might have intervened in the dependency proceedings to opine on whether father's home was a better placement for the children than mother's home. Father fails to provide any authority to support this claim.

If we were to reach the merits of father's claim of improper ICWA notice, we would nevertheless reject his argument. When the juvenile court or social worker has "reason to believe" an Indian child is involved in a dependency proceeding, the designated agent of the identified tribe must be contacted by "telephone, facsimile, or electronic mail" by "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).) This procedure was followed in this case, where SSA contacted the Oneida Indian Nation's designated agent and provided all information obtained from father, and the tribe confirmed that neither father nor the children were enrolled or eligible for enrollment. There was no "reason to know"

---

[3] In relevant part, ICWA states: "[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." (25 U.S.C. § 1902.)

12

the children were Indian children, so the greater notice requirements of section 224.3 never came into play.

DISPOSITION

The judgment is affirmed.

FYBEL, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.